R. J. HASWELL, Respondent,

v.

LIBERTY MUTUAL INSURANCE COM-
PANY, and Liberty Mutual Fire Insur-
ance Company, Appellants.

No. 59267.

Supreme Court of Missouri,
En Banc.

Nov. 14, 1977.

Russell G. Clark, Springfield, for appellants.

Lincoln J. Knauer, Jr., Springfield, Thomas G. Strong and Mathew W. Placzek, Jr., on rehearing, Springfield, for respondent.

FINCH, Judge.

This is an action for wrongful initiation of a civil action against the plaintiff herein. The jury returned a verdict against both defendants for $25,000 actual damages, plus $75,000 punitive damages against Liberty Mutual Insurance Company and $25,000 punitive damages against Liberty Mutual Fire Insurance Company. On appeal by defendants to the Court of Appeals, Springfield District, the court affirmed. The case was ordered transferred to this court which then adopted an opinion which reversed and re-

manded for new trial. Subsequently, plaintiff's motion for rehearing was sustained and additional briefing was requested. We now affirm. In this opinion we utilize without quotation marks portions of the opinion of the court of appeals and the prior opinion in this court.

On appeal defendants attack the sufficiency of the evidence to support the verdict and judgment in certain particulars hereinafter discussed, allege various trial errors and contend that the verdict was excessive.

Defendants were authorized to write casualty, property, fire and marine-type insurance as well as bonds. They are described as "direct writers," i. e., companies which write insurance or bonds only through their own employee-agents rather than through general agents, brokers or others who may be licensed to write for or broker insurance business for other companies. Prior to 1963, one Don W. Kinder was a licensed agent of defendant companies in St. Louis. In 1963 he became their resident representative in Springfield, Missouri. Under various writings agreed to by Kinder, he was bound to devote full time to defendants' business. He was not to act as an intermediary for a policyholder or prospect with another company or indirectly place insurance in another company through some other broker or agent nor was he to accept remuneration of any type for any such referrals or services.[1] Although it was common knowledge in the insurance world that defendant companies were "direct writers," the foregoing agreements between Kinder and defendants and the restrictions placed on Kinder by such agreements were kept in Kinder's personal file by defendants, were kept confidential and were not generally known by general agents, brokers or others in the insurance business.

In order to retain the good will of policyholders or prospects requiring coverage on risks undesirable to or not insured against by defendants, it sometimes became advisable for defendants' agents to assist those persons in procuring coverage with other companies. In such event Kinder could perform that service only with defendants' full knowledge and consent. If granted, Kinder was not permitted to receive any commissions, gifts or other compensation for such services. When he was in St. Louis, Kinder did have permission to solicit boiler insurance which was placed in the Mutual Boiler Company under a corporate agreement between that company and defendants. However, that agreement did not apply to Springfield and no comparable agreement existed between defendants and any company or broker in Springfield.

In 1963 Kinder met plaintiff who then was employed by an insurance agency-broker in Springfield. Kinder told plaintiff of the arrangements defendants had in St. Louis for brokerage services and inquired whether plaintiff would help him with similar problems in the Springfield area. Plaintiff agreed and thereafter assisted Kinder in securing coverage which Kinder said the defendants could not or would not write.[2] When plaintiff could not provide the desired coverage, he sought assistance from other brokers or agents.

In January 1967 plaintiff started his own insurance business. He was a licensed broker and was agent for several companies which accepted regular and specialized risks. He continued on request to assist Kinder in securing coverage. He did the same for other agents and by October 1967 he was placing business for about 35 other agents. This increased to some 100 agents by January 1969. This placement of business for other agents became very time

1. Kinder also agreed that all policy forms, manuals, expiration information, and other documents or records relating to defendants' business were to remain defendants' property and be used exclusively in defendants' interest. Should his employment with defendants be terminated for any reason, Kinder contracted that for 18 months after termination he would not engage in the insurance business, other than life, within 25 miles of Springfield.

2. Although plaintiff could not share commissions with Kinder, he did occasionally buy Kinder a gift or a meal. This seemed to be a general practice in the insurance business in such situations.

consuming because an agent who is not a broker may not solicit business to be placed in another company by which he is not licensed. Consequently, it was necessary for plaintiff personally to contact all prospective policyholders referred to him by Kinder. The same was true in the case of other agents who asked him to place business for them. As plaintiff's business increased, he did not have the time to make all of these personal contacts. Therefore, plaintiff began to assist these agents, including Kinder, to obtain licenses as agents for companies which plaintiff represented. That permitted them to deal directly with prospective policyholders and they could receive 50 per cent of the commission on policies written. This lessened plaintiff's workload in connection with insurance written for Kinder and other agents but also decreased the amounts he received as commission on those policies. After this change occurred, Kinder dealt primarily with plaintiff's secretary rather than with plaintiff.

In June 1968 defendants' district manager became concerned about sales through Kinder's office because defendants' business was down some $80,000 from the previous year. He was advised by an agent for defendants in the Kansas City area that Kinder had been placing business with plaintiff's agency. No inquiry was made of plaintiff and, apparently, the manager and other personnel employed by or representing defendants neglected to discover that Kinder also was placing business with agencies other than plaintiff's. The manager also ascertained from the Missouri Division of Insurance that Kinder had become licensed with several other companies.

On August 13, 1968, the defendants' district manager and his superior confronted Kinder with what they had learned. He readily admitted that he had violated his contract with defendants. He was terminated on the spot and he then delivered

defendants' records to the district manager pursuant to his contract.

Apprehensive of what Kinder might do subsequent to being fired, the district manager requested that defendants' resident claims adjuster in Springfield keep watch as to Kinder's activities. After developments which will be detailed subsequently, defendants filed suit against Kinder and plaintiff on October 23, 1968. Counts I and II sought to enjoin Kinder from engaging in the insurance business in violation of his contract with defendants and to recover damages from him for breach of contract. Counts III and IV were against both Kinder and plaintiff herein. Count III alleged that the two of them had conspired together to use confidential information relating to defendants' business and to divert business from defendants to other companies. The petition alleged that in furtherance of the conspiracy, licenses for Kinder were secured with other companies competing with defendants and that business was placed with those companies to the detriment of defendants.[3] The petition also alleged that Kinder and plaintiff misrepresented the nature and quality of defendants' policies. Count IV sought to enjoin Kinder and plaintiff from continuing to do the acts of which they were accused in Count III.

Defendants' suit for damages and injunctive relief against plaintiff herein was dismissed without prejudice by defendants on October 16, 1970. Thereafter, on December 23, 1970, this suit was filed.

Before Kinder was fired in August 1968 he shared an office with defendants' local claim adjuster and a secretary employed by defendants. Neither of these people knew the contents of the agreements between defendants and Kinder, and the claim adjuster acknowledged that he was under the impression that it was proper for Kinder, under certain circumstances, to place busi-

---

3. In their petition the defendants alleged that in furtherance of the alleged conspiracy plaintiff participated in securing these licenses for Kinder. Actually, Kinder became licensed by 15 other companies but plaintiff had no part in securing 6 of those licenses. Apparently de-

fendants did not make sufficient inquiry to ascertain this fact. At least, they did not recognize this fact in charging that licensing in other companies was arranged to divert business to companies represented by plaintiff.

ness through another company if defendants did not want it. The adjuster and secretary knew Kinder was selling life insurance for another company, and were aware that Kinder discussed casualty insurance placement with agents other than plaintiff. The assumption by defendants in filing suit that plaintiff necessarily knew of the limitations on Kinder's authority because he worked for a direct-writing company was inconsistent with these beliefs and impressions of their own employees in the office with Kinder.

Plaintiff testified in this trial that although he knew Kinder's employers (defendants) were direct-writing companies, he was never informed of and was unaware of Kinder's contractual obligations to defendants, that he did not know that Kinder was violating his contract in dealing with plaintiff or other agents and brokers and that he did not know that Kinder was not permitted by defendants to become an agent for other insurance companies. There was considerable emphasis in the testimony of the open, nonsecretive dealings that Kinder had with plaintiff and with several other agencies.

Plaintiff also testified that in August 1968 Kinder told him that he [Kinder] was no longer associated with defendants because defendants had not lived up to their agreement and objected to Kinder holding licenses with other companies. Kinder indicated he would open his own agency and continue to sell life insurance through another company and casualty insurance through plaintiff. At Kinder's request, plaintiff gave him permission to give his prospects plaintiff's telephone number and to use plaintiff's office stationery as he had allowed other agents to do in similar circumstances. As a temporary measure, Kinder was given the use of a work table near plaintiff's desk when he was infrequently in plaintiff's office. Kinder told plaintiff that he could usually be reached at the office of the life insurance company for whom he was selling insurance. Under this arrangement Kinder was to do his own paper work, contact the companies directly, etc., and the commissions were to be split 60% for Kinder and 40% for plaintiff. Plaintiff did not instruct Kinder where to go or whom to see. In addition, plaintiff testified that Kinder was not paid a salary by him and was not his employee.

In regard to business defendants allegedly lost as a result of the conspiracy, an exhibit introduced by plaintiff disclosed that from January through July 1968, 29 of defendants' previous policyholders had their insurance rewritten through other companies during that period. Of the 29 lost, only 5 (or possibly 7) were written by companies represented by plaintiff. The 29 policies represented a premium dollar loss to defendants in excess of $100,000; however, $85,000 to $99,000 of this premium loss represented policies which were not placed through plaintiff's agency.

Plaintiff testified that 4,500 policies went though his brokerage department yearly, of which he would probably see only 500. When he was questioned at the trial regarding policies on his books that had previously been written by defendants, plaintiff stated that he had not known they were in the office until he was preparing answers to interrogatories propounded in the present suit. Plaintiff did state that when it came to his attention that Kinder was changing policyholders from defendants' companies to an insurer represented by plaintiff, Kinder upon inquiry would explain that these were risks which defendants had cancelled or did not want or could not match in premiums.

Defendants' investigation before suit was filed against plaintiff and Kinder for conspiracy did not disclose that plaintiff had access to or had used the intimate and confidential knowledge of defendants' trade practices, customers, connections, insurance policyholders, or policy expiration dates. Likewise, defendants had no evidence that plaintiff had ever misrepresented the nature and quality of any of defendants' policies of insurance to defendants' existing or potential policyholders. Defendants did not interview plaintiff or any of his employees and they made no investigation of plain-

tiff's reputation before bringing suit for conspiracy, although there was considerable testimony at trial to indicate that plaintiff's reputation in the business world and otherwise was excellent.

█ Defendants' first contention on appeal is that there was insufficient evidence to show that they acted without probable cause[4] in initiating the suit for conspiracy against plaintiff Haswell and that the trial court should have sustained their motion for a directed verdict on that basis. In resolving this question we follow the general rule that since the verdict and judgment in this case were in favor of plaintiff, we examine the evidence in the light most favorable to plaintiff, giving plaintiff the benefit of all reasonable inferences therefrom. Bearing in mind that establishment of want of probable cause involves proving a negative, slight proof thereof is all that is required to make a prima facie case. *Hughes v. Aetna Ins., Co.*, 261 S.W.2d 942, 945 (Mo.1953). We also recognize that while dismissal of defendants' action against plaintiff was some evidence of a lack of probable cause, that alone is not sufficient basis for a conclusion of a lack of probable cause. *Jones v. Phillips Petroleum Co.*, 186 S.W.2d 868, 875 (Mo. App.1945).

█ Probable cause for the initiation of a criminal prosecution "is reasonable cause and may be defined as the existence of such a state of facts as would warrant an ordinarily cautious and prudent man in the belief that the accused was guilty of the offense charged." *Higgins v. Knickmeyer-Fleer Realty & Investment Co.*, 335 Mo. 1010, 74 S.W.2d 805, 813 (1934). However, guilt or innocence of a criminal offense is not involved in a civil case and for that reason the test of probable cause for initiation of a civil action has been stated somewhat differently. In *Hughes v. Aetna Ins.*

*Co., supra*, the court said, 261 S.W.2d at 949:

" 'With the necessary changes in points of detail, the same principles determine questions of probable cause in civil proceedings as in criminal.' *Wilcox v. Gilmore*, 320 Mo. 980, 986, 8 S.W.2d 961, 962. At the same local citation it is said: 'Probable cause "consists of a belief in the charge or facts alleged, based on sufficient circumstances to reasonably induce such belief in a person of ordinary prudence in the same situation." ' "

The same definition is stated in *Woods v. Standard Personal Loan Plan, Inc.*, 420 S.W.2d 380, 384 (Mo.App.1967) and *Young v. Jack Boring's, Inc.*, 540 S.W.2d 887, 895 (Mo.App.1976). In Restatement (Second) of Torts, § 675 (1977), the definition is amplified by adding to the requirement that there be a reasonable belief in the existence of the facts upon which the claim is based the additional requisite that he "correctly or reasonably believes that under such facts the claim may be valid under the applicable law." We have concluded that this enlargement of the definition clarifies and more accurately states that which is necessary to the existence of probable cause. Thus, it can be said that probable cause for initiating a civil action consists of a belief in the facts alleged, based on sufficient circumstances to reasonably induce such belief by a person of ordinary prudence in the same situation, plus a reasonable belief by such person that under such facts the claim may be valid under the applicable law.

In contending that the trial court should have directed a verdict on the basis that the evidence did not show lack of probable cause for initiating suit, defendants argue that except for the question of whether plaintiff had actual knowledge of the terms and conditions of Kinder's contractual arrangements with defendant companies,

---

4. The six elements necessary to make a submissible case for malicious prosecution (and wrongful initiation of civil proceedings) have been: (1) the commencement of a prosecution against plaintiff; (2) its legal causation by defendant; (3) its termination in favor of plaintiff; (4) the absence of probable cause therefor; (5)

the presence of malice; and (6) damage to plaintiff therefrom. *Hoene v. Associated Dry Goods Corp.*, 487 S.W.2d 479, 483 (Mo.1972). On this appeal defendants question only whether plaintiff made sufficient proof as to items (4) and (5).

there was no real variance or dispute between the facts on which defendants and their attorney relied in deciding to commence the suit against Haswell and the facts as disclosed by the evidence in the case. On that basis they urge that it was purely a question of law for the court as to whether probable cause existed, citing *Dodson v. MFA Insurance Co.*, 509 S.W.2d 461, 467 (Mo.1974); *McFarland v. Union Finance Co.*, 471 S.W.2d 497 (Mo.App.1971); and *Woods v. Standard Personal Loan Plan, Inc.*, 420 S.W.2d 380 (Mo.App.1967), and that a verdict in their favor should have been directed.

We do not agree. The transcript reveals numerous disputed factual issues which the court was required to submit to the jury for determination. In the first place there was, as defendants concede, a dispute as to whether the evidence established knowledge by plaintiff of Kinder's obligations under his contracts with defendants. Defendants did not check to ascertain factually whether plaintiff knew that under Kinder's contract he was prohibited from becoming an agent for other companies or that absent express approval he could not seek to place business elsewhere if not available from defendants. They did not interview plaintiff or any of his employees. They simply assumed that plaintiff knew of those secret restrictions, contending that the nature of defendants as direct-writing companies brought home that knowledge. On the other hand, plaintiff testified that he didn't know of such restrictions. There also was evidence that others didn't know thereof and believed that under some circumstances Kinder could place insurance elsewhere. Employees in defendants' office in Springfield so believed.

█ There also was a dispute as to the sufficiency of the investigation by defendants prior to bringing suit and whether further investigation would have indicated that plaintiff had not conspired with Kinder to improperly and illegally divert business from defendants to other insurance companies. The rule is that "[t]he defendant in a malicious prosecution action 'is to be held responsible, not only for the facts he knew when he caused the suit to be instituted but also for all other facts pertinent to the suit which he could have ascertained by due diligence prior to causing the law to be put in motion.' *McAnarney v. Commonwealth Loan Co.*, Mo.App., 208 S.W.2d 480, 486, citing *LaChance v. National Pigments & Chemical Co.*, Mo.App., 104 S.W.2d 693; *Jones v. Phillips Petroleum Co.*, Mo.App., 186 S.W.2d 868. This is but another way of saying defendants in such cases are responsible for facts they could have known by reasonable inquiry. *Randol v. Kline's, Inc.*, 322 Mo. 746, 18 S.W.2d 500." *Hughes v. Aetna Ins. Co.*, 261 S.W.2d 942, 949–950 (Mo.1953). *Accord, Hoene v. Associated Dry Goods Corp.*, 487 S.W.2d 479, 483 (Mo. 1972).

The evidence disclosed that at the time Kinder was placing insurance business with plaintiff, he also was placing business with other agencies in Springfield. It also indicated that of the policies lost by defendants during a period prior to termination of Kinder, a very substantial number of the policies, both as regards number and premium, were not placed through plaintiff's agency. However, defendants did not investigate sufficiently to learn of these facts prior to filing the conspiracy suit against plaintiff.

The evidence also disclosed that Kinder helped license 35 agents in addition to Kinder, this having been done to enable them to place business with those companies and relieve plaintiff of the necessity of contacting all of those prospective insureds personally. Defendants did not investigate sufficiently to ascertain this fact. Neither did they check to see whether Kinder had been licensed in companies other than those represented by plaintiff in which plaintiff assisted him in securing licenses, although information as to such licensing was available in the office of the Division of Insurance in Jefferson City.

Defendants' petition seeking recovery against plaintiff for conspiracy with Kinder alleged that they had conspired to misrepresent the nature and quality of defendants'

insurance policies but they did not investigate to ascertain whether misrepresentations had been made and they had no evidence when suit was filed of any such misrepresentations.

There was also evidence that defendants made no investigation as to plaintiff's reputation in the insurance community or in Springfield and the surrounding area generally prior to suing him for conspiracy, alleging that he and Kinder engaged in an "illegal, unlawful and malicious conspiracy." The evidence disclosed that plaintiff's reputation in the business community and otherwise was excellent.

Under the test of *Hughes* quoted above, defendants were chargeable with knowledge of the facts above only to the extent they could have been ascertained by reasonable inquiry. What would constitute a reasonable inquiry under the circumstances of this case was a matter clearly within the jury's province to determine.

■ In view of the foregoing we hold that the issue of probable cause was one for resolution by the jury pursuant to instructions from the court on that issue.[5]

■ In addition to contending that their motion for directed verdict should have been sustained on the basis that lack of probable cause was not established, defendants also contend that said motion should have been sustained for the reason that the evidence failed to establish that they had acted maliciously in instituting the suit against Haswell. We find no merit in this contention. The rule in Missouri is that "[w]here want of probable cause is shown, malice may be inferred by the jury. *Stubbs v. Mulholland*, 168 Mo. 47, 67 S.W. 650; *Randol v. Kline's, Inc.*, 332 Mo. 746, 18 S.W.2d 500." *Hoene v. Associated Dry Goods Corp.*, 487 S.W.2d 479, 483 (Mo.1972). Hence, the issue of whether the evidence established that the defendants acted maliciously was for the jury to decide.

In this case, in addition to the evidence previously recited which was relevant both to whether there was probable cause and whether defendants acted maliciously in filing suit against plaintiff, there was additional evidence which the jury could consider on the issue of malice. It consisted of a letter from one of defendants' local counsel to defendants' branch manager in Kansas City and their assistant counsel in Boston with reference to the suit against Haswell and Kinder which stated, in part, as follows: "Count III * * * is stated in conspiracy for the purpose of being able to introduce evidence with respect to [Kinder and plaintiff] against the other * * * which probably would not be possible if the count was stated solely on substantive basis. * * * You will also note that we have requested an accounting from the date when Kinder first came to Springfield for [defendants] rather than from the date on which he first became licensed as an agent for other companies. The reason for this is primarily to harass both [Kinder and plaintiff] who may be quite unhappy in having

---

5. In Missouri the issue of probable cause is submitted to the jury, along with other issues to be resolved, in MAI 23.07, which is as follows:

"Your verdict must be for the plaintiff if you believe:

First, defendant instigated a judicial proceeding against the plaintiff which terminated in favor of plaintiff, and

Second, in so doing defendant acted maliciously and without reasonable grounds, and

Third, plaintiff was thereby damaged."

In drafting that instruction the committee substituted the words "reasonable grounds" for "probable cause." No definition of "reasonable grounds" is included in MAI 23.07, nor do the notes on use call for a definition thereof. In *Boquist v. Montgomery Ward & Co., Inc.*, 516 S.W.2d 769 (Mo.App.1974), defendant tendered an instruction which undertook to define "reasonable grounds." The trial court refused the instruction and defendant on appeal sought reversal and remand on account of that refusal. The court of appeals discussed the question of whether "reasonable grounds" might need further definition and concluded that in a proper case the issue would require careful consideration. It held that in that particular case such consideration was not required because the tendered instruction clearly was bad.

In this case defendants did not tender an instruction defining "reasonable grounds" and this question is not raised as an issue on this appeal. Hence, it is not before us for resolution.

to make an accounting for a longer period, especially since this might reveal information which they would rather the Internal Revenue Service wouldn't have." Clearly, a submissible case on malice was made.

Defendants made no assignment in their original brief on appeal that malice is not an appropriate constituent element of an action for wrongful initiation of a civil action. They contended only that the evidence was insufficient to make a submissible case on the question of malice. However, in our consideration of this appeal the question has arisen as to whether in such actions we should substitute for a finding of malice a requirement that the jury find that the proceedings were "initiated primarily for a purpose other than securing the adjudication of the claim on which they are based." This is the language employed in Restatement (Second) of Torts, § 676 (1977). See also § 674 which makes this same substitution.

Our earlier opinion proposed to adopt these (and other) sections of the Restatement. However, upon reconsideration we have concluded that such action would be inappropriate. We believe the theory of the malicious prosecution cause of action as developed in our decisional law is sound. Thus, the only reason to adopt the Restatement's substitution for our element of malice would be for the purpose of more clearly presenting the issue to the jury. Although we believe that the Restatement language may embody our decisional law on the subject, it would appear that the pertinent sections and the comments thereto could also be interpreted as a departure from our

previous interpretation of the element of malice. This would create a potential for confusion whereas the current definition of malice contained in MAI 16.01 already fully and clearly presents this element to the jury. We therefore decline to adopt the Restatement formulation in this area.

■ Next, defendants urge that the trial court should have directed a verdict for them on the basis that they relied in good faith on advice of counsel in filing suit against Haswell and Kinder. Good faith reliance on advice of counsel in commencing judicial proceedings against another is a defense to an action for malicious prosecution or wrongful initiation of a civil action if there has been full disclosure by the client to his attorney of all material facts, including those within client's actual knowledge and those of which he might have learned by reasonable diligence. However, it is an affirmative defense on which defendant has the burden of proof. *Huffstutler v. Coates*, 335 S.W.2d 70, 80 (Mo.1960); *Hughes v. Aetna Ins. Co.*, *supra*, 261 S.W.2d at 951. *See also Webb v. Byrd*, 203 Mo. App. 589, 219 S.W. 683 (1920). The evidence adduced at trial was reasonably susceptible of the inference that in several particulars defendants had not fully and truthfully advised counsel of all the facts they had or which were readily available to them. Thus, the trial court acted correctly in this case in submitting this issue to the jury pursuant to an instruction which told them that they must find for defendants if they found that defendants had made the required disclosure and in good faith acted thereon.[6]

---

**6.** "Instruction No. 5
　"Your verdict must be for defendants if you believe:
　"First, before commencing the judicial proceeding against the plaintiff, defendants consulted in good faith with an attorney learned in the law, and
　"Second, defendants, through their agents, communicated to such attorney, in good faith, all the facts within their knowledge, or which they might have learned by reasonable diligence, upon the merits of such judicial proceeding as were made in said judicial proceeding against plaintiff, and

"Third, defendants' consultation and communication with said attorney was in good faith, with a view to seeking the advice of said attorney, and
　"Fourth, that said attorney, upon the submission of said facts, advised defendants that they had the legal right to the relief sought in the defendants' judicial proceeding against the plaintiff, and
　"Fifth, that the judicial proceeding by defendants against plaintiff were begun and carried on pursuant to the legal advice of said attorney, in good faith, and not in pur-

■ An additional claim of error asserted by defendants is that the trial court erred in admitting evidence of attorneys' fees paid as a result of the original suit by defendants against plaintiff. Defendants do not dispute the proposition that attorneys' fees incurred in defense of the first suit are a proper item of recovery in an action seeking recovery for wrongful initiation of that earlier suit. However, such fees are recoverable only to the extent of their reasonable value, *Dailey v. Stout*, 353 S.W.2d 833 (Mo.App.1962); 25 C.J.S. *Damages* § 91(2), and defendants contend that plaintiff offered no evidence that the fee was reasonable.

■ Defendants liken this case to those concerning medical expenses where our courts have generally held that in order to recover for medical expenses incurred there must be substantial evidence that such expenses were reasonable and necessary. However, the cases cited properly recognize that such proof may be made by inference from the circumstances, and that *payment* of a bill for such services should properly be considered some substantial evidence of the reasonableness of the charge. *Myers v. Karchmer*, 313 S.W.2d 697 (Mo. 1958); *Wise v. Towse*, 366 S.W.2d 506, 508 (Mo.App.1963); *Hay v. Ham*, 364 S.W.2d 119 (Mo.App.1962). The rationale of these rulings is plain. Where no evidence of collusion or bad faith appears, the court and the jury are entitled to presume and ascribe honest motives, good faith and right conduct in the preparation and submission of the bill. *Hay, supra, citing Cordray v. City of Brookfield*, 88 S.W.2d 161 (Mo.1935). Based upon the common experience of everyday life, the jury may infer that people do not pay bills where the reasonableness of the charge is disputed. This rationale would appear to be particularly applicable in situations such as the case before us. There could be no clear *expectation* of recovering the amount paid because such recovery is entirely contingent on the outcome of the second suit. Thus, the likelihood of collusion is remote. We therefore hold that sufficient evidence of reasonableness was presented here.[7] Of course, if the reasonableness of the amount charged is disputed, the defendant remains free to attack the reasonableness of the charge by evidence, argument or both.

■ Defendants next allege that the trial court erred in permitting plaintiff's counsel, during closing argument, to submit a mathematical formula to the jury in regard to punitive damages. The argument noted that the $200,000 prayed in punitive damages was approximately 1/100th of one percent of the defendants' assets (which had been received in evidence). Counsel further remarked that this amount was comparable to imposing a fine of $10 on a man with $100,000 in assets. Defendants' objection was that this was comparable to a "per diem" argument which would cause the jury to believe they had a guideline to follow in assessing damages.

We do not agree. Taken in its context, the argument was merely a calculation based on the evidence which the jury could have made for themselves. It did not instruct the jury as to any fixed guideline but rather was a more broadly based appeal to the jury to consider what amount would effectively punish the defendants and deter them and others from like conduct. This is precisely what the jury was instructed to consider if it determined that punitive damages were appropriate. In any event, the defendants have not shown that this argument prejudiced the jury against them in light of the fact that the jury assessed only half the sum prayed by plaintiff as punitive damages. The point is overruled.

■ Defendants allege error in admitting evidence of loss of business suffered by plaintiff because plaintiff had agreed in a

suance of a previous fixed determination to commence such judicial proceeding."

7. Other jurisdictions passing on this precise issue have held that payment of attorneys' fees in a malicious prosecution action by the plaintiff is prima facie evidence of the reasonableness of said fees. *Barlin v. Barlin*, 156 Cal. App.2d 143, 319 P.2d 87 (1957); *Drumm v. Cassnum*, 61 Kan. 467, 59 P. 1078 (1900).

pretrial conference that loss of profits would not be an issue in the case. There is no transcript of the discussion in which this agreement was purportedly made and thus the point cannot properly be reviewed. Even if the pretrial agreement could be shown, the evidence of which defendants complain was admitted for a proper purpose —i. e., testimony by various businessmen that they had declined to deal with the plaintiff as this related to the emotional distress he suffered—and thus the proper remedy would have been a limiting instruction rather than the withdrawal instruction tendered by defendants.

The defendants further allege error in the trial court's refusal to admit certain documents and other evidence which defendants claim was relevant to the issues of probable cause and malice. Counts I and II of the original suit were clearly irrelevant in that they contained no allegations against Haswell but rather were directed exclusively to assertions of misconduct on the part of Kinder. The findings of fact and conclusions of law issued by the trial court in the first suit were likewise irrelevant in this action because they were expressly limited to the relationship between Kinder and defendants and were void of any reference to Haswell.

Defendants' argument that they were entitled to read amended Count III of the first suit into evidence because plaintiff introduced original Count III misperceives the theory of plaintiff's cause of action. Originally, plaintiff's petition alleged malicious prosecution by reason of the filing of both the original petition in the first suit and the amended petition. However, plaintiff amended his petition prior to trial and deleted all reference to the amended petition of the first suit. Thus, the case was tried on the theory that the cause of action accrued with the filing of the original petition and plaintiff was thereby damaged. The defendants' amendment of Count III of the original suit was therefore irrelevant to any issue in this suit.

■ The trial court also refused to admit the deposition of Peter Lindsay, defendants' employee, which was taken by counsel for Haswell in preparation for the original proceeding. The issues ·presented in the first suit were clearly quite different from those presented in the present case. Furthermore, defendants' offer of this deposition was deficient in that the record does not reflect any offer of proof at the time the evidence was refused that Mr. Lindsay was unavailable at the time of trial as required by rule 57.07(b). We need not determine whether the subsequent comment of one of defendants' witnesses that Mr. Lindsay was "in the State of Minnesota. I don't know the exact location" would satisfy the rule's requirement of competent evidence because we find no allegation in the record at the time of the offer that any evidence of unavailability would be offered. We find no error in excluding this evidence.

■ Defendants' final contention is that the actual and punitive damages awarded were excessive. We have reviewed the transcript and have determined that there was sufficient evidence to support the jury's award. Many of the elements of actual damages, such as the emotional and physical distress of the plaintiff, are not susceptible of calculation in a specific monetary amount. Nor can we say that the jury's award of punitive damages was "so out of all proper proportion to the factors involved as to reveal improper motives or a clear absence of the honest exercise of judgment." *Beggs v. Universal C.I.T. Credit Corp.*, 409 S.W.2d 719, 724 (Mo.1966). Thus, we find no abuse of discretion by the trial court in declining to order a remittitur or a new trial.

Judgment affirmed.

MORGAN, C. J., and BARDGETT, RENDLEN and SEILER, JJ., concur.

HENLEY, J., dissents in separate dissenting opinion filed.

DONNELLY, J., dissents and concurs in separate dissenting opinion of HENLEY, J.

HENLEY, Judge, dissenting.

I respectfully dissent.

I believe that in determining whether plaintiff made a submissible case on the issue of whether defendants had probable cause to initiate their civil suit against plaintiff and Kinder, the majority opinion overlooks matters that should be considered in an action for wrongful initiation of civil proceedings and applies the test applicable only to an action for malicious prosecution of criminal proceedings.

Matters or points of difference between the two types of proceedings that should have been considered in determining submissibility of this case are discussed in Comment d, § 675, Restatement, Torts 2d (1977) as follows:

"In one particular a private prosecutor's reasonable belief in the guilt of the accused differs from the reasonable belief of one who initiates private civil proceedings against another. A private prosecutor does not have reasonable grounds for believing that the accused has conducted himself in a particular manner, if he merely entertains a suspicion even though he reasonably believes it may be verified upon further investigation. * * * On the other hand, when the proceedings are civil, while the person initiating them cannot have a reasonable belief in the existence of the facts on which the proceedings are based if he knows that the alleged facts are not true and his claim is based on false testimony, it is enough if their existence is not certain but he believes that he can establish their existence to the satisfaction of court and jury. In a word, the initiator of private civil proceedings need not have the same degree of certainty as to the relevant facts that is required of a private prosecutor of criminal proceedings. In many cases civil proceedings, to be effective, must be begun before all of the relevant facts can be ascertained to a reasonable degree of certainty. To put the initiator of civil proceedings to a greater risk of liability would put an undesirable burden upon those whose rights cannot be otherwise effectively enforced."

I believe that the majority opinion requires of the initiator of private civil proceedings a much greater degree of certainty as to the relevant facts than is required by the Restatement. I agree with the Restatement.

For the reasons stated, I would hold that plaintiff failed to make a submissible case, would adopt Chapter 30, Restatement of the Law, Torts 2d, and would reverse the judgment and remand the case for retrial.